## AMERICAN EXPRESS CO v COMMERCIAL SAV BANK & TR CO et AMERICAN EXPRESS CO v OHIO SAVINGS BANK & TRUST CO et

Ohio Appeals, 6th Dist, Lucas Co

Decided June 10, 1935

Tenney, Harding, Sherman & Rogers, and Marshall, Melhorn & Marlor, Toledo, for plaintiff.

John W. Bricker, Attorney General, Columbus, and Sholto M. Douglas, Toledo, for defendants.

### OPINION

By LLOYD, J.

The two above captioned cases involve the determination of the question whether or not the American Express Company is entitled to have declared as preferential claims, the proceeds of sales of travelers cheques on deposit in The Commercial Savings Bank & Trust Company and The Ohio Savings Bank & Trust Company at the time of their closing for liquidation, there being no dispute as to the respective amounts thereof. When necessary herein to separately refer to them, The Commercial Savings Bank & Trust Company will be called the "Commercial," The Ohio Sav-

ings Bank & Trust Company the "Ohio," and the American Express Company the "Company."

S. H. Squire has been substituted as defendant herein for Ira J. Fulton, whom he succeeded as Superintendent of Banks.

Each of the banks, by order of its board of directors, closed on August 15, 1931, and on August 17, 1931, the Superintendent of Banks took possession of the property and assets of each of them for purposes of liquidation, and since then has been continuously in possession thereof.

In 1928 and 1929 the Commercial and the Ohio respectively had negotiations with the Company as to their acting as agents for the Company in the sale of travelers cheques, each of the banks to receive as compensation therefor one-half of one per cent on the amounts of their respective sales. These travelers cheques are in the nature of drafts, and, when issued, are valid obligations of the Company, and are negotiable by endorsement thereon of the purchasers thereof. Various letters were exchanged between the two banks and the Company as to the prospective arrangement—three in 1928 between the Commercial and the Company, and four in 1929 between the Ohio and the Company. Although the arrangement made with each of the banks had no contractual relation to the other, the correspondence had with each of them by the Company was of similar import. The correspondence indicates that prior thereto there had been some conversation between officers of the Company with each of the banks. The pertinent parts of the letters passing between the Commercial and the Company read as follows:

"January 17, 1928.
"We are agreeable to allowing your bank to credit our account with the proceeds of sales. * * * during each month, with the understanding that you will send us on the last day of each month a draft on Chicago or New York * * * the procedure to be followed will be to send us purchaser's application on the day sale is made, accompanied by a duplicate deposit slip showing credit to our account."

To which the Commercial replied:
"January 18, 1928.
"We beg to advise that the arrangement whereby the money for the sale of Travelers Cheques will remain in our institution for the month and then it will be remitted to you, the face value plus the commission of the checks sold during the month, and this policy will continue for the entire year.

"We are making now all the necessary preparations and we will start on this system on the 20th of this month. Consequently the end of the month will always be on the 20th, and we will see that you shall receive a check together with the statement for the whole month. The sales advices will be forwarded to you promptly as usual, on day of sale, but we do not deem it will be necessary to send you a duplicate deposit slip, because that will only be a lot of extra work for us and it does not mean anything as far as you are concerned. The amount deposited to your account you can obtain from the sales advices."

The Company wrote in part on January 26, 1928:
"* * * There are two items, however, that I am sorry I will have to call on you to change. One of them is that it will be necessary for you to forward a memorandum to us showing the amount of money placed to our credit on each day's business, which action is necessary in view of the fact that the application form you send us covering each sale is immediately sent to our Comptroller's office in New York, and we have no record of the sales included in your total deposit if we find it necessary to check back the remittance sent us.

"The other item is that I would like to have you remit for the accumulated sales on the last business day of each month. This would mean that from January 20th up to and including the 31st, would be one remittance, and the month of February and each succeeding month would be closed out when the month was completed."

In the letters passing between the Ohio and the Company appears the following:
"May 1, 1929.
"The Dime Savings Bank & Trust Company of your city, which was taken over by your good institution, had an arrangement with us whereby all sales of Travelers Cheques were credited to an account carried on their books under the title 'American Express Company.' On the last business day of each month a remittance was made to this office covering the accumulated amount in that account. * * *

"It occurs to us that perhaps you will wish to look into the matter with a view to following the same plan as that formerly in operation with the Dime Bank. * * * Had our plan been in operation last year, you not only would have enjoyed an account from our company, but the balance would have averaged a trifle more than $3,000.00."

To which the Ohio replied on May 6. 1929:

"We are in receipt of your letter of May 1, with reference to your opening an account with us to take care of the sale of American Express Company checks sold by us, with the understanding that we will remit to you the balance at the close of each month. We will be very glad to try this out and see how it works out. * * * We are enclosing two signature cards on which you can furnish us the specimen signatures of those authorized to sign against the account in case it is necessary for you to do so at any time."

In its letter of May 8, 1929, in reply to the foregoing, the Company wrote:

"* * * We are returning your signature cards herewith, inasmuch as this is a special account not subject to signatures and it will, therefore, not be necessary for us to file such authority with you. Application blank and duplicate deposit slip covering sales should be sent us at the close of each day, and on the last business day of each month a remittance for the accumulated amount."

The letter of the Ohio in reply, dated May 11, 1929, stated:

"We are instructing our foreign department to deposit all proceeds from sales of Travelers Checks to an account which will be carried in your name and the balance of this account, at the end of each month, will be remitted direct to you, together with the monthly statement for the corresponding period."

From time to time thereafter various amounts of travelers cheques were delivered to each of the banks by the Company for the purpose of sale, and upon receipt of each allotment a trust receipt was signed by the bank receiving same, the form and conditions thereof being as follows:

"Received in trust from the American Express Company, Travelers Cheques of the American Express Company, as follows:

| Travelers Cheques Quantity Denomination | Checks numbered From... to... inclusive |
|---|---|
| $10 | M |
| $20 | N |
| $50 | P |
| $100 | R |
| £5 | |
| £10 | |
| $250 | T.C. |
| Ex Order | Z |
| $500 | T.C. |
| Ex Order | X |

"The undersigned agrees and undertakes that the said cheques, while in its custody, shall have the same care and protection as its own bearer securities; and further agrees to accept responsibility for the due issue thereof and to account to the American Express Company therefor, and for the proceeds received from the sale thereof. The said cheques until sold and the proceeds thereof when sold shall at all times remain the property of the American Express Company.

................Bank.

"Date ........, 19... ...........Cashier."

The Commercial opened upon its book an account known as "Travelers Check Liability Account," and the Ohio on its books opened one known as "American Express Company Account."

These accounts were used exclusively by the respective banks to show the amounts received from sales of "travelers cheques" after deducting their commissions. The amounts so received by the respective banks were credited to their respective accounts and debited to the banks. No signature cards were furnished to the Company nor was any arrangement made or means provided for the Company to draw upon the accounts by check or otherwise, nor was any interest payable or paid thereon by either of the banks. The amount of the proceeds of all sales of travelers cheques by each of the banks, less its commissions, was shown as a credit upon the account therein, and the account was debited with the amount of the draft sent monthly by it to the Company. The Company had deposited no moneys in either of the banks and had none therein except the proceeds of the sales of travelers cheques, pursuant to the contract therefor herein outlined. The Company at no time had information as to the method of bookkeeping of the respective banks, except as indicated in the letters from which we have quoted.

On August 13, 1931, the Company wrote a letter to the Commercial, a part of which reads:

"An analysis by our management of the special arrangement which your good bank enjoys, through which you hold as trust funds the proceeds of sales of our Travelers Cheques until the last day of each month, when you remit for the same, shows the arrangement to be unprofitable to our company and they desire to terminate it. On receipt of this letter will you, therefore, kindly mail us tomorrow, August 14th, a draft on Chicago for all accumulated sales

of Travelers Cheques up to and including that date?"

The reply thereto reads in part as follows:

"We are instructing our Travel Department to comply with your request in connection with your letter and we will take the letter in question, and will be glad to have your advice as to just how you want us to handle these remittances in the fund."

The Commercial, however, failed to comply therewith and did not remit the proceeds of sales then held by it.

On the same day a similar letter was sent by the Company to the Ohio, about the only difference therein being that the phrase "your good institution" was substituted for "your good bank," carry-overs from the original correspondence, not material, and informative only in the sense that at least some of those not residing in Toledo were wiser than some of those who did. The Ohio promptly complying with this request, the Company now seeks a preference for the sales proceeds accumulating therein between that time and its later closing.

There was at all times cash in the vaults of the banks in excess of the respective sums received by them from sales of the Company's travelers cheques.

Do these facts create a relationship between the banks and the Company of simply debtor and creditor, or did each of them hold the proceeds received from sales of travelers cheques in trust for the Company?

If this initial letter correspondence had between the banks and the Company is to be regarded as exclusively and finally expressing the terms and conditions of the contract, then the court would have no difficulty in determining that a debtor-creditor relationship was intended and established thereby, since there is no inhibition therein, express or implied, against the use by the banks of the proceeds received from the sale of the Company cheques; and the fact of the varying agreed times for remittance thereof by the banks to the Company would create no such implication. Considered alone, the legal effect of these letters could not be otherwise. But with them also must be considered the essence of the agreement which is unequivocally expressed in the trust receipt, signed by the banks upon the delivery to them from time to time of travelers cheques which they were to sell and which would not have been delivered had the receipts not been signed. The last one of the preliminary letters in relation to the sales agency of the Commercial was dated January 26, 1928, on which date the first cheques were sent to it by the Company. The last of the Ohio letters, dated May 11, 1929, was an answer of the company to one of the Ohio, dated May 8, 1929. In this letter of the Company, as we have already stated, is a paragraph reading:

"We are returning your signature cards, in as much as this is a special account not subject to signatures and it will, therefore, not be necessary for us to file such authority with you."

In the letters written prior to the forwarding of the cheques and supplies, without which neither bank could have prosecuted the arranged agency, we find nothing in contravention of or inconsistent with the clearly-expressed intention of the parties as evidenced by the unambiguously stated terms and conditions of the receipts which in fact and purpose express the consummating result of the negotiations theretofore had; on the contrary, reading the letters and receipts conjunctively evinces an intended harmonious result culminating in the definitely stated terms and conditions of the trust receipts prepared and required by the Company.

The mere fact that the banks had permission to remit the proceeds of sales at varying times would seem to be too trifling a circumstance to warrant serious consideration as affecting the purport and intent of the contract. Each bank expressly agreed by signing the receipts that the cheques were "received in trust" for the purposes recited therein, and when sold the proceeds thereof were to remain the property of the Company. The cheques were the exclusive property of the Company and the agreement provides that the banks were to have no right therein or thereto except the privilege of sale thereof, which privilege could be exercised only upon the substitution of the proceeds of sale for the cheques sold, and which, in lieu of the cheques were to continue the property of the Company. If the proceeds of the sale of Cheques were, immediately upon receipt by the banks, to become and thereafter to remain the property of the Company, while in the banks, it is not quite clear how, at the same time, the money so received could be considered as a general deposit and therefore merely a debt of the banks to the Company. No interest was to be paid to the Company, and nowhere

in the record do we find any intimation that the banks might use the money for investment or for any other than the expressly designated purpose. If we are correct in our factual conclusion, and as to the law applicable thereto, then the right of the Company to have the proceeds of sales in the respective banks at the time of their closing for liquidation declared a preference over claims of general creditors, would not be destroyed by the mere fact that the money had been commingled with the general funds of the bank.

The court, however, is of the opinion that the payment thereof must be made without interest, and from the cash in the vaults of the respective banks, in accordance with the rule announced in **State ex Toledo Theatres & Realty Co. v Fulton, Supt. of Banks, 124 Oh St, 360, 178 NE, 585.**

Decree accordingly.

OVERMYER and CARPENTER, JJ, concur.